## UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | |
|---|---|
| KEREN JEANFORT, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No.: |
| v. | |
| TD AMERITRADE, INC., and THE CHARLES SCHWAB CORPORATION, | JURY TRIAL DEMANDED |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Keren Jeanfort ("Plaintiff") brings this Class Action Complaint against TD Ameritrade, Inc., and The Charles Schwab Corporation ("Defendants"), in his individual capacity and on behalf of all others similarly situated, and alleges, upon personal knowledge as to his own actions and his counsels' investigations, and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

1.    This class action arises out of the recent data breach ("Data Breach") involving TD Ameritrade, Inc., a domestic for-profit financial institution headquartered in Omaha, Nebraska, and The Charles Schwab Corporation, a domestic for-profit financial institution headquartered in Westlake, Texas.

2.    Defendants failed to reasonably secure, monitor, and maintain Personally Identifiable Information ("PII" or "Private Information") provided by consumers, including, without limitation, names, Social Security numbers, financial account information, dates of birth, other government identification numbers, and other personal identifiers of consumers stored on

their private network. As a result, Plaintiff and other consumers suffered present injury and damages in the form of identity theft, loss of value of their PII, out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the unauthorized access, exfiltration, and subsequent criminal misuse of their sensitive and highly personal information.

3.     By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class Members, Defendants assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion. Defendants' conduct in breaching these duties amounts to negligence and/or recklessness and violates federal and state statutes.

4.      Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendants' failure to take reasonable steps to protect the PII of Plaintiff and Class Members and warn Plaintiff and Class Members of Defendants' inadequate information security practices. Defendants disregarded the rights of Plaintiff and Class Members by knowingly failing to implement and maintain adequate and reasonable measures to ensure that the PII of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use.

5.     As a direct and proximate result of Defendants' data security failures and the Data Breach, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party, and Plaintiff and Class Members have suffered actual, present, concrete injuries. These injuries include: (i) the current and imminent risk of fraud and identity theft (ii) lost or diminished value of PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their

PII; (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the PII; (vi) the invasion of privacy; (vii) the compromise, disclosure, theft, and unauthorized use of Plaintiff and the Class Members' PII; and (viii) emotional distress, fear, anxiety, nuisance and annoyance related to the theft and compromise of their PII.

6.    Plaintiff and Class Members seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and remains at risk due to inadequate data security.

7.    Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## II. PARTIES

### *Plaintiff Keren Jeanfort*

8.    Plaintiff Keren Jeanfort is, and at all times relevant has been, a resident and citizen of Florida, where he intends to remain. Plaintiff received a "Notice of Data Breach" letter dated August 3, 2023, on or about August 22, 2023 from "TD Ameritrade Client Services." [1]

9.    The letter notified Plaintiff that on May 30, 2023, Defendants became aware of an alert issued by Progress Software – the company responsible for the MOVEit file transfer program

---

[1] See Exhibit 1 – TD Ameritrade Data Breach Letter.

– addressing a critical vulnerability affecting MOVEit, a software tool used widely by businesses and government agencies, including Defendants, to transfer data. The letter notified Plaintiff that after an investigation, Defendants discovered unauthorized access to their customers' personal information which includes, but is not limited to Plaintiff's name, Social Security Number, financial account information, date of birth, government identification numbers, and other personal identifiers.

10.    The letter further advised Plaintiff that he should spend time mitigating his losses by taking steps to help safeguard his information, including following recommendations by the Federal Trade Commission regarding identity theft protection and placing a fraud alert or security freeze on his credit file.

11.    The letter also encouraged Plaintiff to sign up for two years of credit and identity monitoring through IdentityForce. The credit and identity monitoring offered is only single bureau credit monitoring.

12.    Defendants obtained and continue to maintain Plaintiff's and Class Members' PII and have a continuing legal duty and obligation to protect that sensitive information from unauthorized access and disclosure. Plaintiff would not have entrusted his PII to Defendants had he known that they would fail to maintain adequate data security. Plaintiff's PII was compromised and disclosed as a result of the Data Breach.

### *Defendant TD Ameritrade, Inc.*

13.    Defendant TD Ameritrade, Inc., is a New York corporation with a principal office location of 200 South 108th Avenue, Omaha, NE 68154. According to the New York Secretary of State, their registered agent is C T Corporation System, located at 28 Liberty Street, New York, NY, United States, 10005.

14.    Defendant TD Ameritrade, Inc. is a stockbroker that offers an electronic trading platform for the trade of financial assets. It operates out of multiple locations across the United States.

15.    All of Plaintiff's claims stated herein are asserted against Defendants and any of their owners, predecessors, successors, subsidiaries, agents and/or assigns.

### Defendant The Charles Schwab Corporation

16.    Defendant The Charles Schwab Corporation is a Delaware corporation with a principal office location of 3000 Schwab Way, Westlake, TX 76262. According to the Delaware Secretary of State, their registered agent is The Corporation Trust Company, located at Corporation Trust Center 1209 Orange St., Wilmington, DE 19801.

17.    Defendant The Charles Schwab Corporation is a is an American multinational financial services company. It offers banking, commercial banking, investing and related services including consulting, and wealth management advisory services to both retail and institutional clients. It operates out of multiple locations across the United States.

18.    The Data Breach notification posted on the website of the Attorney General of Maine stated that the "entity" filing the notice of the Data Breach was "TD Ameritrade, Inc. and Charles Schwab & Co., Inc., a TD Ameritrade affiliate" and listed the address of that "entity" as 3000 Schwab Way, Westlake, TX 76262, which is the corporate headquarters of Charles Schwab.

19.    All of Plaintiff's claims stated herein are asserted against Defendants and any of their owners, predecessors, successors, subsidiaries, agents and/or assigns.

### III. JURISDICTION AND VENUE

20.    This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum

or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendants to establish minimal diversity.

21.    The District of Nebraska has personal jurisdiction over Defendants named in this action because Defendants and/or their parents or affiliates are headquartered in this District and Defendants conduct substantial business in Nebraska and this District through TD Ameritrade's headquarters, offices, parents, subsidiaries, and affiliates.

22.    Venue is proper in this District under 28 U.S.C. §1391(b) because Defendants and/or their parents or affiliates are headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

### IV. FACTUAL ALLEGATIONS

***Background: Defendants Acquire, Collects, and Stores the PII of Plaintiff and Class Members***

23.    Defendants are financial institutions offering a broad range of financial services for individuals and businesses.

24.    Plaintiff and Class Members were persons who provided, or who third-parties provided on their behalf, their PII to Defendants in conjunction with utilizing Defendants' banking services.

25.    Defendants acquired, collected, and stored the PII of Plaintiff and Class Members.

26.    Defendants required the submission of and voluntarily accepted the PII as part of their business and had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties. Defendants has a legal duty to keep consumer's PII safe and confidential.

27.    Defendants retain and store this information, and derive a substantial economic

benefit from the PII that it collects. But for the collection of Plaintiff's and Class Members' PII, Defendants would be unable to perform their financial services.

28.     Plaintiff and Class Members relied on the sophistication of Defendants and their network to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members demand security to safeguard their PII.

29.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

30.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII.

31.     The information held by Defendants in their computer systems and networks included the unencrypted PII of Plaintiff and Class Members.

***The Data Breach***

32.     On or about May 30, 2023, Defendants became aware of an alert issued by Progress Software – the company responsible for the MOVEit file transfer program – addressing a critical vulnerability affecting MOVEit, a software tool used widely by businesses and government agencies, including Defendants, to transfer data. After becoming aware of the alert, Defendants claim they "promptly halted any use of MOVEit Transfer" and "thoroughly investigated the incident in close consultation with independent experts".

33.     With no explanation for their nine-week delay, on August 3, 2023, Defendants started notifying the approximately 61,000 unfortunate customers whose PII was stolen over two

months ago, PII which includes name, Social Security Number, financial account information, date of birth, government identification numbers, and other personal identifiers.

34.    To date, Defendants have not revealed most of the findings of the investigation it commissioned. Defendants have not revealed when the unauthorized actor first gained access to their systems, nor has it revealed the mechanism by which the unauthorized actor first gained access to their systems. Defendants have not revealed whether the unauthorized actor was able to access Defendants' broader computer systems and network.

35.    Even worse, Defendants have failed to disclose the exact nature of the unauthorized access to Plaintiff's and Class Members' PII.  Instead, Defendants speak in generalities and equivocations, claiming that it only knows that Plaintiff' name and Social Security number were accessed, but that additional information "*may have included one or more of the following*: financial account information, date of birth, government identification numbers, and other personal identifiers."

36.    This "disclosure" amounts to no real disclosure at all, as it fails to inform Plaintiff and Class Members what information belonging to them was affected, leaving Plaintiff and Class Members to believe that all of this incredibly sensitive PII was compromised in this Data Breach.

37.    Defendants' offering of "security guarantees for losses due to unauthorized activity in their TD Ameritrade and Schwab accounts" also belies Defendants' equivocal statements that Plaintiff's and Class Members' PII, including financial account information, "may have [been] included," and instead establishes that a broader scope Plaintiff's and Class Members' sensitive PII was in fact affected, accessed, compromised, and exfiltrated from Defendants' computer systems.

38.    Despite knowing that the breach occurred on May 30, 2023, the Data Breach notice was not received by victims of the data breach until almost three (3) months after that.

39.    The result of Defendants' "thorough investigation" is not provided in the notice to Plaintiff and Class Members, and the notice does not explain whether the accessed data has been or will be misused by the hackers.  However, upon information and belief, Defendants have no methods, policies, or procedures in place that would afford their customers (like Plaintiff and Class Members) any mechanism or opportunity to report misuse of the data back to Defendants, and the investigation commissioned by Defendants did not survey Defendants' clients whose data was breached for evidence of misuse.

40.    The attacker accessed and acquired files in Defendants' computer systems containing unencrypted PII of Plaintiff and Class Members, including but not limited to name, Social Security Number, financial account information, date of birth, government identification numbers, and other personal identifiers.

41.    On or around August 8, 2023, Defendants disclosed the Data Breach to multiple States' Attorney Generals.

42.    Defendants first notified their impacted consumers of the incident on or around August 3, 2023, sending written notifications to individuals whose personal information was compromised in the Data Breach.

43.    Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

44.    Plaintiff further believes his PII, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

### *Plaintiff Keren Jeanfort's Experience*

45.    Based upon the Notice of Data Breach letter that he received, Plaintiff's PII, including but not limited to his name, Social Security Number, financial account information, date

of birth, government identification numbers, and other personal identifiers, was acquired, stored, and maintained by Defendants.

46.    To date, Defendants have done next to nothing to adequately protect Plaintiff and Class Members, or to compensate them for their injuries sustained in this Data Breach.

47.    Defendants' data breach notice letter downplays the theft of Plaintiff's and Class Members PII, when the facts demonstrate that the PII was targeted, accessed, and exfiltrated in a criminal cyberattack. The fraud and identity monitoring services offered by Defendants are only for two years, are not three-bureau monitoring, and place the burden squarely on Plaintiff and Class Members by requiring them to expend time signing up for the service and addressing timely issues when the service number for enrollment does not work properly.

48.    Moreover, Defendants instruct Plaintiff and members of the Class to mitigate their damages by self-monitoring their accounts and credit reports to ensure that they remain uncompromised as a result of Defendants' failure to properly secure their PII.

49.    As a result of the Data Breach, Plaintiff heeded Defendants' warning and spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Defendants' direction by way of the Data Breach notice where Defendants advised Plaintiff to mitigate his damages by, among other things, monitoring his accounts for fraudulent activity.

50.    Even with the best response, the harm caused to Plaintiff cannot be undone.

51.     Plaintiff further suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Private Information—a form of intangible property that Plaintiff entrusted to Defendants, which was compromised in and as a result of the Data Breach.

52.     He also lost his benefit of the bargain by paying for financial services that failed to provide the data security that was promised.

53.     Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

54.     Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties and possibly criminals.

55.     Future identity theft monitoring is reasonable and necessary and such services will include future costs and expenses.

56.     Plaintiff has a continuing interest in ensuring that Plaintiff's Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### ***Defendants Knew or Should Have Known of the Risk Because the Banking Sector is Particularly Susceptible to Cyber Attacks***

57.     Defendants knew and understood unprotected or exposed PII in the custody of banking firms such as Defendants is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII through unauthorized access, as banking firms maintain highly sensitive PII, including Social Security numbers and financial information.

58.     Moreover, it has been well-reported that the banking/credit/financial services

industry is one of the most "at-risk" industries when it comes to cybersecurity attacks.[2]  Attacks against the financial sector increased 238% globally from the beginning of February 2020 to the end of April, with some 80% of financial institutions reporting an increase in cyberattacks, according to cyber security firm VMware.

### The Data Breach Was Foreseeable

59.     At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

60.     Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network, amounting to potentially millions of individuals' detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

61.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[3]

62.     Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the financial industry preceding the date of the breach.

---

[2] *See, e.g.,* https://www.agcs.allianz.com/news-and-insights/expert-risk-articles/financial-services-risk-cyber.html.

[3] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last accessed July 21, 2023).

63.     Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

64.     Therefore, the increase in such attacks, and the attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

### *Value of PII*

65.     The PII of consumers remains of high value to criminals, as evidenced by the prices offered through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[4] According to the Dark Web Price Index for 2021, payment card details for an account balance up to $1,000 have an average market value of $150, credit card details with an account balance up to $5,000 have an average market value of $240, stolen online banking logins with a minimum of $100 on the account have an average market value of $40, and stolen online banking logins with a minimum of $2,000 on the account have an average market value of $120.[5] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[6]

---

[4] *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[5] *Dark Web Price Index 2021*, Zachary Ignoffo, March 8, 2021, available at: https://www.privacyaffairs.com/dark-web-price-index-2021/

[6] *In the Dark,* VPNOverview, 2019, available at https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

66.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.

67.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information…[is] worth more than 10x on the black market."[7]

68.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing, or even give false information to police.

69.     The fraudulent activity resulting from the Data Breach may not come to light for years.

70.     There is also a robust legitimate market for the type of sensitive information at issue here. Marketing firms utilize personal information to target potential customers, and an entire economy exists related to the value of personal data.

71.     Moreover, there may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[8]

---

[7] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers,* IT World, (Feb. 6, 2015), available at: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Aug. 23, 2021).

[8] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at*: https://www.gao.gov/assets/gao-07-737.pdf (last accessed Aug. 23, 2021).

72.    As such, future monitoring of financial and personal records is reasonable and necessary well beyond the one of protection offered by Defendants.

***Defendants Failed to Properly Protect Plaintiff's and Class Members' Private Information***

73.    Defendants could have prevented this Data Breach by properly securing and encrypting the systems containing the Private Information of Plaintiff and Class Members. Alternatively, Defendants could have destroyed the data, especially for individuals with whom it had not had a relationship for a period of time.

74.    Defendants' negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to companies like Defendants to protect and secure sensitive data they possess.

75.    Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

76.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[9]

---

[9] *See generally Fighting Identity Theft With the Red Flags Rule: A How-To Guide for Business*, FED. TRADE COMM., https://www.ftc.gov/business-guidance/resources/fighting-identity-theft-red-flags-rule-how-guide-business (last accessed May 1, 2023).

77.    The ramifications of Defendants' failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

78.    To prevent and detect unauthorized cyber-attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[10]

79.    To prevent and detect cyber-attacks, including the cyber-attack that resulted in the

Data Breach, Defendants could and should have implemented, as recommended by the United

States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**.  Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks…
- **Use caution with links and when entering website addresses.**  Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)…
- **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.
- **Keep your personal information safe.**  Check a website's security to ensure the information you submit is encrypted before you provide it….
- **Verify email senders.**  If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.
- **Inform yourself.**  Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.
- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic…[11]

---

[10] *Id.* at 3-4.

[11] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://us-cert.cisa.gov/ncas/tips/ST19-001 (last accessed Aug. 23, 2021).

80.     To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates;
- Use threat and vulnerability management;
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities;
- Hunt for brute force attempts;
- Monitor for cleanup of Event Logs;
- Analyze logon events

;

**Harden infrastructure**

- Use Windows Defender Firewall;
- Enable tamper protection;
- Enable cloud-delivered protection;
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office; [Visual Basic for Applications].[12]

---

[12] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last accessed Aug. 23, 2021).

81.     Moreover, given that Defendants were storing the PII of Plaintiff and Class Members, Defendants could and should have implemented all the above measures to prevent and detect cyberattacks.

82.     The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII of Plaintiff and Class Members.

83.     As a result of computer systems in need of security upgrades and inadequate procedures for handling email phishing attacks, viruses, malignant computer code, and hacking attacks, Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

84.     Because Defendants failed to properly protect and safeguard Plaintiff's and Class Members' Private Information, an unauthorized third party was able to access Defendants' network, and access Defendants' database and system configuration files and exfiltrate that data.

### Defendants Violated the Gramm-Leach-Bliley Act

85.     Defendants are financial firms that give mortgage loans to individuals and businesses, and are therefore subject to the Gramm-Leach-Bliley Act ("GLBA").

86.     Defendants collect nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period Defendants were subject to the requirements of the GLBA, 15 U.S.C. §§ 6801.1, *et seq.*, and is subject to numerous rules and regulations promulgated on the GLBA Statutes. The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the Consumer Financial Protection Bureau ("CFPB") became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the

implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

87.     Accordingly, Defendants' conduct is governed by the Privacy Rule prior to December 30, 2011, and by Regulation P after that date.

88.     Both the Privacy Rule and Regulation P require financial institutions to provide customers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous."16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Defendants violated the Privacy Rule and Regulation P.

89.     Upon information and belief, Defendants failed to provide annual privacy notices to customers after the customer relationship ended, despite retaining these customers' PII and storing and/or sharing that PII on their network. Plaintiff has never received any privacy notice from Defendants.

90.    Defendants failed to adequately inform their customers that it was storing and/or sharing, or would store and/or share, the customers' PII on their inadequately secured network and would do so after the customer relationship ended.

91.    The Safeguards Rule, which implements Section 501(b) of the GLBA,15 U.S.C. § 6801(b), requires institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4. As alleged herein, Defendants violated the Safeguard Rule.

92.    Defendants failed to assess reasonably foreseeable risks to the security, confidentiality, and integrity of PII in their custody or control.

93.    Defendants failed to design and implement information safeguards to control the risks identified through risk assessment, and regularly test or otherwise monitor the effectiveness of the safeguards' key controls, systems, and procedures.

94.    Defendants failed to adequately oversee service providers.

95.     Defendants failed to evaluate and adjust their information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances.

### *Defendants Failed to Comply with FTC Guidelines*

96.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

97.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[13]

98.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

99.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be

---

[13] Protecting Personal Information: A Guide for Business, Federal Trade Commission (2016). Available at https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed May 16, 2023).

used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

100.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions clarify the measures businesses take to meet their data security obligations.

101.    Defendants failed to properly implement basic data security practices.

102.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

103.    Defendants were always fully aware of their obligation to protect the Private Information of Plaintiff and Class Members. Defendants were also aware of the significant repercussions that would result from their failure to do so.

### *Defendants Failed to Comply with Industry Standards*

104.    As shown above, experts studying cyber security routinely identify the financial sector as being particularly vulnerable to cyberattacks because of the value of the PII which financial firms collect and maintain.

105.    Several best practices have been identified that at a minimum should be implemented by financial service providers like Defendants, including, but not limited to: educating all employees; strong passwords; **multi-layer security, including firewalls**, anti-virus,

and anti-malware software; **encryption, making data unreadable without a key; multi-factor authentication;** backup data; and limiting which employees can access sensitive data.

106.    Other best cybersecurity practices that are standard in the financial industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

107.    Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

108.    The foregoing frameworks are existing and applicable industry standards in the financial industry, and Defendants failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

109.    Upon information and belief, Defendants failed to comply with one or more of the foregoing industry standards.

### *Defendants' Negligent Acts and Breaches*

110.    Defendants participated and controlled the process of gathering the Private Information from Plaintiff and Class Members.

111.    Defendants therefore assumed and otherwise owed duties and obligations to Plaintiff and Class Members to take reasonable measures to protect the information, including the

duty of oversight, training, instruction, testing of the data security policies and network systems. Defendants breached these obligations to Plaintiff and Class Members and/or were otherwise negligent because it failed to properly implement data security systems and policies that would adequately safeguarded Plaintiff's and Class Members' Sensitive Information. Upon information and belief, Defendants' unlawful conduct included, but is not limited to, one or more of the following acts and/or omissions:

    a) Failing to design and maintain an adequate data security system to reduce the risk of data breaches and protect Plaintiff's and Class Members Sensitive Information;

    b) Failing to properly monitor their data security systems for data security vulnerabilities and risk;

    c) Failing to test and assess the adequacy of their data security system;

    d) Failing to develop adequate training programs related to the proper handling of emails and email security practices;

    e) Failing to put into develop and place uniform procedures and data security protections;

    f) Failing to adequately fund and allocate resources for the adequate design, operation, maintenance, and updating necessary to meet industry standards for data security protection;

    g) Failing to ensure or otherwise require that it was compliant with FTC guidelines for cybersecurity;

    h) Failing to ensure or otherwise require that it was adhering to one or more of industry standards for cybersecurity discussed above;

i)   Failing to implement or update antivirus and malware protection software in need of security updating;

j)   Failing to require encryption or adequate encryption on their data systems; and

k)   Otherwise negligently and unlawfully failing to safeguard Plaintiff's and Class Members' Private Information provided to Defendants, which in turn allowed cyberthieves to access their IT systems.

## <u>COMMON INJURIES & DAMAGES</u>

112.   As result of Defendants' ineffective and inadequate data security practices, Plaintiff and Class Members now face a present and ongoing risk of fraud and identity theft.

113.   Due to the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; and (i) the continued risk to their Private Information, which remains in Defendants' possession, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

***The Risk of Identity Theft to Plaintiff and Class Members Is Present and Ongoing***

114.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

115.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity – or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

116.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

117.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[14] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web

---

[14] *What Is the Dark Web?,* Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last accessed May 16, 2023).

users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[15] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

118.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal information like the PII at issue here.[16] The digital character of PII stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[17] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[18]

119.    Social Security numbers, for example, are among the worst kinds of personal information to have been stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss

---

[15] *Id.*

[16] *What is the Dark Web*? – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last accessed May 16, 2023).

[17] *Id.*; What Is the Dark Web?, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/

[18] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web

of an individual's Social Security number, as is the case here, can lead to identity theft and

extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other
> personal information about you. Identity thieves can use your number and your
> good credit to apply for more credit in your name. Then, they use the credit cards
> and don't pay the bills, it damages your credit. You may not find out that someone
> is using your number until you're turned down for credit, or you begin to get calls
> from unknown creditors demanding payment for items you never bought. Someone
> illegally using your Social Security number and assuming your identity can cause
> a lot of problems.[19]
>
> What's more, it is no easy task to change or cancel a stolen Social Security number.
> An individual cannot obtain a new Social Security number without significant
> paperwork and evidence of actual misuse. In other words, preventive action to
> defend against the possibility of misuse of a Social Security number is not
> permitted; an individual must show evidence of actual, ongoing fraud activity to
> obtain a new number.

120.    Even then, new Social Security number may not be effective, as "[t]he credit

bureaus and banks are able to link the new number very quickly to the old number, so all of that

old bad information is quickly inherited into the new Social Security number."[20]

121.    Identity thieves can also use Social Security numbers to obtain a driver's license or

official identification card in the victim's name but with the thief's picture; use the victim's name

and Social Security number to obtain government benefits; or file a fraudulent tax return using the

victim's information. In addition, identity thieves may obtain a job using the victim's Social

Security number, rent a house or receive medical services in the victim's name, and may even give

the victim's personal information to police during an arrest resulting in an arrest warrant being

---

[19] Social Security Administration, *Identity Theft and Your Social Security Number*, available at:
https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed May 16, 2023).

[20] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR
(Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-
millions-worrying-about-identity-theft (last visited Sep 13, 2022).

issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[21]

122.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[22]

123.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[23] Defendants did not rapidly report to Plaintiff and the Class that their Private Information had been stolen.

124.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

125.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

126.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and Class

---

[21] *Identity Theft and Your Social Security Number,* Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Sep. 13, 2022).

[22] *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last accessed October 21, 2022).

[23] *Id.*

Members will need to remain vigilant against unauthorized data use for years or even decades to come.

127.    The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[24]

128.    The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[25]

129.    According to the FTC, unauthorized PII disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout. The FTC treats the failure to employ reasonable and appropriate measures to

---

[24] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited July 21, 2023).

[25] *See generally* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.[26]

130.    Defendants' failure to properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

### *Loss of Time to Mitigate the Risk of Identity Theft and Fraud*

131.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

132.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as Defendants' Notice instructs them that they should be "regularly monitoring [their] accounts for unusual activity [and] reviewing and monitoring free credit reports."

133.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing

---

[26] *See e.g.,* https://www.ftc.gov/news-events/news/press-releases/2016/07/commission-finds-labmd-liable-unfair-data-security-practices (last accessed: October 21, 2022).

passwords, reviewing and monitoring credit reports and accounts for unauthorized activity—which may take years to discover and detect—and filing police reports.

134.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office, who released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[27]

135.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[28]

136.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[29]

---

[27] See United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[28] *See* Federal Trade Commission, IdentityTheft.com, https://www.identitytheft.gov/Steps (last visited July 7, 2022).

[29] "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at:

https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited Sep 13, 2022).



137.    In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[30] Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[31]

---

[30] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Sep. 13, 2022) ("GAO Report").

[31] *See* https://www.identitytheft.gov/Steps (last visited Sep. 13, 2022).

### *Diminution of Value of the Private Information*

138.    PII is a valuable property right.[32] its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

139.    Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[33]

140.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[34] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[35][36] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[37]

141.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and

---

[32] *See*, e.g., John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[33] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec

(July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Sep. 13, 2022).

[34] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[35]  https://datacoup.com/

[36] https://digi.me/what-is-digime/

[37] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

diminished in its value by their unauthorized and potential release onto the Dark Web, where it may soon be available and holds significant value for the threat actors.

142.    To date, Defendants have done little to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach – Defendants have only offered two years of inadequate identity monitoring services through IdentityForce, despite Plaintiff and Class Members being at risk of identity theft and fraud for the foreseeable future. Defendants have not offered any other relief or protection.

143.    The two years of credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud. Defendants also place the burden squarely on Plaintiff and Class Members by requiring them to expend time signing up for that service, as opposed to automatically enrolling all victims of this Data Breach.

144.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes – e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

145.    It must be noted there may be a substantial time lag – measured in years – between when harm occurs versus when it is discovered, and also between when Private Information and/or

financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

146.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

147.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[38] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

148.    Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

---

[38] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web*, New Report Finds, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last accessed May 16, 2023).

149.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information.

### *Injunctive Relief Is Necessary to Protect Against Future Data Breaches*

150.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

### **<u>CLASS ALLEGATIONS</u>**

151.    Pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, Plaintiff brings this class action on behalf of himself and the following proposed Class (the "Class"), which is preliminarily defined as:

> **All persons Defendants identified as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach.**

152.    Excluded from the Classes are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

153.    Plaintiff and the Class Members satisfy the numerosity, commonality, typicality,

adequacy, and predominance prerequisites for suing as representative parties pursuant to Fed. R. Civ. P. 23(a)(1).

154.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, Defendants have identified approximately 61,000 individuals who had their PII compromised in this Data Breach. The identities of Class Members are ascertainable through Defendants' records, Class Members' records, publication notice, self-identification, and other means.

155.    <u>Commonality</u>, Fed R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a)  Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiff and Class Members;

b)  Whether Defendants had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c)  Whether Defendants had duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

d)  Whether Defendants failed to adequately safeguard the Private Information of Plaintiff and Class Members;

e)  Whether and when Defendants actually learned of the Data Breach;

f)  Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g)  Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h)  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i)  Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j)  Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

k)  Whether Defendants violated the consumer protection statutes invoked herein;

l)  Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

m) Whether Plaintiff and Class Members are entitled to restitution as a result of Defendants' wrongful conduct; and

n) Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

156.    Typicality, Fed.. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of the Data Breach, due to Defendants' misfeasance.

157.    Predominance. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

158.    Adequacy of Representation, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

159.    Superiority, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum

simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

160.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

161.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, uniform methods of data collection, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

162.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

163.    Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly secure the Private Information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

164.    Further, Defendants have acted or refused to act on grounds generally applicable to the Class and, accordingly, class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

165.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

      a.    Whether Defendants owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

      b.    Whether Defendants breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

      c.    Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

      d.    Whether an implied contract existed between Defendants on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

      e.    Whether Defendants breached the implied contract;

f.      Whether Defendants adequately and accurately informed Plaintiff and Class
Members that their Private Information had been compromised;

g.      Whether Defendants failed to implement and maintain reasonable security
procedures and practices appropriate to the nature and scope of the
information compromised in the Data Breach;

h.      Whether Defendants engaged in unfair, unlawful, or deceptive practices by
failing to safeguard the Private Information of Plaintiff and Class Members;
and

i.      Whether Class Members are entitled to actual, consequential, and/or
nominal damages, and/or injunctive relief as a result of Defendants'
wrongful conduct.

## FIRST CAUSE OF ACTION
### NEGLIGENCE
**(On Behalf of Plaintiff and the Class)**

166.    Plaintiff re-alleges and incorporates by reference each of the preceding paragraphs
as though fully incorporated herein.

167.    Defendants knowingly collected, came into possession of, and maintained
Plaintiff's and Class Members' PII, and had a duty to exercise reasonable care in safeguarding,
securing, and protecting such information from being compromised, lost, stolen, misused, and/or
disclosed to unauthorized parties.

168.    Defendants had a duty under common law to have procedures in place to detect and
prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' PII.

169.    Defendants had full knowledge of the sensitivity of the PII and the types of harm
that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

170.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duty included a responsibility to implement processes by which they could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

171.    Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair. . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

172.    Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiff and Class members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' PII within Defendants' possession.

173.    Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiff and Class members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiff's and Class Members' PII.

174.    Defendants, through their actions and/or omissions, unlawfully breached their duty to timely disclose to Plaintiff and Class Members that the PII within Defendants' possession might have been compromised and precisely the type of information compromised.

175.    Defendants' breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' PII to be compromised.

176.    As a result of Defendants' ongoing failure to notify Plaintiff and Class Members regarding the type of PII has been compromised, Plaintiff and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

177.    Defendants' breaches of duty caused Plaintiff and Class Members to suffer from identity theft, loss of time and money to monitor their finances for fraud, and loss of control over their PII.

178.    As a result of Defendants' negligence and breach of duties, Plaintiff and Class Members are in danger of imminent harm in that their PII, which is still in the possession of third parties, will be used for fraudulent purposes.

179.    Plaintiff seeks the award of actual damages on behalf of himself and the Class.

180.    In failing to secure Plaintiff's and Class Members' PII and promptly notifying them of the Data Breach, Defendants are guilty of oppression, fraud, or malice, in that Defendants acted or failed to act with a willful and conscious disregard of Plaintiff's and Class Members' rights. Plaintiff, therefore, in addition to seeking actual damages, seeks punitive damages on behalf of himself and the Class.

181.    Plaintiff seeks injunctive relief on behalf of the Class in the form of an order compelling Defendants to institute appropriate data collection and safeguarding methods and policies with regard to patient information.

### SECOND CAUSE OF ACTION
#### UNJUST ENRICHMENT
#### (On Behalf of Plaintiff and the Class)

182.    Plaintiff re-alleges and incorporates by reference each of the preceding paragraphs as though fully incorporated herein.

183.    Defendants benefited from receiving Plaintiff's and Class Members' PII by their ability to retain and use that information for their own benefit. Defendants understood this benefit.

184.    Defendants also understood and appreciated that Plaintiff's and Class Members' PII was private and confidential, and their value depended upon Defendants maintaining the privacy and confidentiality of that information.

185.    Plaintiff and Class Members conferred a monetary benefit upon Defendants in the form of providing (or having third-parties provide on their behalf) their PII to Defendants with the understanding that Defendants would pay for the administrative costs of reasonable data privacy and security practices and procedures. In exchange, Plaintiff and Class members should have received adequate protection and data security for such PII held by Defendants.

186.    Defendants knew Plaintiff and Class members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the PII of Plaintiff and Class Members for business purposes.

187.    Defendants failed to provide reasonable security, safeguards, and protections to the PII of Plaintiff and Class Members.

188.    Under the principles of equity and good conscience, Defendants should not be permitted to retain money belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures mandated by industry standards.

189.    Defendants wrongfully accepted and retained these benefits to the detriment of Plaintiff and Class Members.

190.    Defendants' enrichment at the expense of Plaintiff and Class Members is and was unjust.

191.    As a result of Defendants' wrongful conduct, as alleged above, Plaintiff and the Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendants, plus attorneys' fees, costs, and interest thereon.

**THIRD CAUSE OF ACTION**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

192.    Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 124.

193.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendants of failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendants' duty.

194.    Defendants violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect PII and not complying with industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach on Defendants' systems.

195.    Defendants' duty to use reasonable security measures also arose under the GLBA, under which Defendants were required to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

196.    Defendants' violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence per se.

197.    Defendants' violation of the GLBA and its Safeguards Rule constitutes negligence *per se.*

198.    Class members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes), and the GLBA, were intended to protect.

199.    Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members. The GLBA, with its Safeguards Rule, was similarly intended.

200.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm entitling them to damages in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
### BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Class)

201.    Plaintiff re-alleges and incorporates by reference each of the preceding paragraphs as though fully incorporated herein.  This Count is plead in the alternative to Count Two.

202.    Defendants required Plaintiff and the Class to provide their personal information, including name, address, date of birth, and Social Security number, as a condition of their engaging Defendants' services.

203.    In so doing, Plaintiff and the Class entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

204.    Defendants offered to provide banking services to Plaintiff and members of the Class in exchange for payment.

205.    Plaintiff and the Class fully performed their obligations under the implied contracts with Defendants.

206.    Had Plaintiff and Class Members known that Defendants would not adequately protect their PII, Plaintiff and members of the Class would not have entrusted Defendants with their PII.

207.    Defendants breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their personal and financial information and by failing to provide timely and accurate notice to them that personal information was compromised as a result of the data breach.

208.    As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiff and the Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the

compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm, entitling them to damages in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
#### (On Behalf of Plaintiff and the Class)

209.   Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

210.   As a condition of obtaining financial services from Defendants, Plaintiff and the Class provided their personal and financial information. In so doing, Plaintiff and the Class entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

211.   Defendants offered to provide financial services to members of the Class in exchange for payment. Defendants also required the members of the Class to provide Defendants with their PII to receive services and training.  Plaintiff and the Class fully performed their obligations under the implied contracts with Defendants.

212.   Had Plaintiff and Class Members known that Defendants would not adequately protect their PII, Plaintiff and members of the Class would not have entrusted Defendants with their PII.

213.    Defendants represented to Plaintiff and Class Members, implicitly and otherwise, that their PII would be secure. Plaintiff and members of the proposed Class relied on such representations when they agreed to provide their PII to Defendants. Plaintiff and the members of the Class would not have entrusted their PII to Defendants without such agreement with Defendants.

214.    The covenant of good faith and fair dealing is an element of every contract. All such contracts impose on each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract along with its form.

215.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

216.    Defendants failed to advise Plaintiff and members of the Class of the Data Breach promptly and sufficiently.

217.    Defendants' duty to safeguard Plaintiff's and Class Member's PII is inherent in and consistent with the contracts entered into by Defendants and Plaintiff and Class Members.

218.    Defendants would not have suffered harm by enacting industry standard measures to safeguard Plaintiff's and Class Member's PII.

219.    Defendants' failure to enact reasonable safeguards to protect the PII it collected resulted in harm to Plaintiff and Class Members and violated the covenant of good faith and fair

dealing. Similarly, Defendants' failure to timely discover the breach, to timely notify affected persons, and to fully detail the scope of the breach in the notices it sent to affected individuals, each suffices to demonstrate a breach of the covenant.

220.    Plaintiff and Class Members have sustained damages because of Defendants' breaches of their agreement, including breaches of it through violations of the covenant of good faith and fair dealing.

221.    Plaintiff, on behalf of himself and the Class, seeks compensatory damages for breach of implied contract of good faith and fair dealing, which includes the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs in addition to all other damages or relief allowed by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, request judgment against Defendants and that the Court grant the following:

A.    For an order certifying the Class, as defined herein, and appointing Plaintiff and his Counsel to represent each such Class;

B.    For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.    prohibiting Defendants from engaging in the wrongful and unlawful acts

described herein;

ii.    requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii.    requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.    requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v.    prohibiting Defendants from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi.    requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

ix.    requiring Defendants to segment data by, among other things, creating firewalls

and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

x.  requiring Defendants to conduct regular database scanning and securing checks;

xi.  requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii.  requiring Defendants to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.  requiring Defendants to implement a system of tests to assess their employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xiv.  requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and

updated;

xv.   requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.   requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.   For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.   For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.   For prejudgment interest on all amounts awarded; and

G.   Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Dated: August 25, 2023.                     Respectfully Submitted,


**WAGSTAFF & CARTMELL, LLC**
*/s/ Tyler W. Hudson*
Tyler W. Hudson Missouri Bar No. 53585
Eric D. Barton Missouri Bar No. 53619
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
(816) 701-1100

thudson@wcllp.com
ebarton@wcllp.com

**ALMEIDA LAW GROUP LLC**
/s/ *David Almeida*_____
David S. Almeida (Pro Hac Vice
forthcoming)
david@almeidalawgroup.com
Elena Belov (Pro Hac Vice forthcoming)
elena@almeidalawgroup.com
849 W. Webster Avenue
Chicago, IL 60614
Tel: (312) 576-3024

Counsel for the Plaintiff and the Putative
Class